# In the United States Court of Federal Claims

No. 11-280C
(Filed Under Seal: August 9, 2011)
(Reissued for Publication: August 25, 2011)[*]

```
*************************************
SYSTEMS APPLICATION &              *
TECHNOLOGIES, INC.,                *
                                   *
                Plaintiff,         *    Bid Protest; 28 U.S.C. § 1491(b)(1);
                                   *    Proposed Corrective Action; Jurisdiction;
v.                                 *    Standing; Ripeness; Review of Informal
                                   *    GAO Electronic-Mail Message as Basis for
THE UNITED STATES,                 *    Decision to Take Corrective Action; Review
                                   *    of Decision to Take Corrective Action
                Defendant,         *    Independent of GAO Electronic-Mail
                                   *    Message; Standard of Review; Declaratory
and                                *    and Injunctive Relief
                                   *
MADISON RESEARCH CORPORATION,      *
                                   *
                Defendant-Intervenor. *
*************************************
```

Craig A. Holman, Washington, DC, for plaintiff.

Matthew F. Scarlato, United States Department of Justice, Washington, DC, for defendant.

Stephen D. Davis II and Tod Dodgen, Huntsville, AL, for defendant-intervenor.

**OPINION AND ORDER**

**SWEENEY**, Judge

     The United States Army Aviation and Missile Life Cycle Management Command Contracting Center awarded a contract to Systems Application & Technologies, Inc. for aerial target flight operations and maintenance services, unseating the incumbent contractor, Madison

---

     [*] This reissued Opinion and Order incorporates the redactions proposed by the parties on August 23, 2011. Redactions are indicated with a bracketed ellipsis ("[. . .]").

Research Corporation, a wholly owned subsidiary of Kratos Defense & Security Solutions, Inc.[1] After Kratos protested the award to the Government Accountability Office ("GAO"), the Army indicated that it would take corrective action by terminating its contract with SA-TECH, amending the solicitation, accepting revised proposals, and making a new source selection decision. SA-TECH filed the instant protest to challenge the proposed corrective action, and has moved for judgment on the administrative record in its favor. The United States and Kratos move to dismiss SA-TECH's complaint for lack of jurisdiction and cross-move for judgment on the administrative record in their favor. For the reasons set forth below, the court denies the motions to dismiss, grants SA-TECH's motion for judgment on the administrative record, and denies the cross-motions for judgment on the administrative record.

## I.  BACKGROUND

### A.  The Solicitation

On June 1, 2010, the Army issued a final Request for Proposals ("RFP") to acquire aerial target flight operations and maintenance services in support of its subscale, ballistic, rotary wing, and ballistic missile target systems.[2] AR 59, 101, 199. As described in the RFP's Statement of Work ("SOW"), the services sought by the Army were "required for training programs, missile/weapon systems test and evaluation programs, missile/weapon systems lot acceptance programs, demonstrations, research and development activities, production verification, and special test programs." Id. at 101. To meet the requirements of the RFP, offerors would be required to provide sufficient qualified personnel and be capable of performing "up to three simultaneous missions comprised of a mixture of target systems . . . ." Id. at 102. At the time the Army issued the RFP, Kratos was performing on the predecessor contract. Id. at 1509.

In the RFP, the Army specified that it would award the contract "to the responsible offeror whose offer, conforming to the solicitation, [was] most advantageous to the Government,

---

[1]  For simplicity, the court will refer to the awarding agency as "the Army." And, in conformance with the parties' usages, the court will refer to plaintiff as "SA-TECH" and defendant-intervenor as "Kratos."

[2]  The court derives the facts in this section from the administrative record ("AR"), the two-page supplement to the administrative record ("SAR"), and the complaint ("Compl."). SA-TECH appended three exhibits to its motion for judgment on the administrative record: an affidavit, one of its filings in Kratos's GAO protest, and a slide presentation. Its GAO protest filing is already included in the administrative record. See AR 1669-88. The court did not consider the other two exhibits because they were not included in the administrative record and were unnecessary for the court's review of the protest. See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) ("The focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the [Administrative Procedure Act].").

cost or price and other factors . . . considered." Id. at 270.  Proposals would be evaluated using three criteria: Technical/Management, Past Performance, and Price/Cost.  Id.  The Technical/Management factor was split into Technical and Management subfactors, with the Technical subfactor being "significantly more important" than the Management subfactor.  Id. Each subfactor had several elements.  Id. at 270-71.  Under the Technical subfactor, offerors would be evaluated on Technical Approach, Labor, and Sample Task elements.  Id. at 270.  The Technical Approach and Labor elements were "approximately equal in importance" and, taken individually, were "significantly more important" than the Sample Task element.  Id.  Under the Management subfactor, offerors would be evaluated on the following elements, listed in descending order of importance: Management Approach; Sample Task; Experience; and Participation by Small, Minority, and Disadvantaged Businesses.  Id. at 270-71.  Overall, the Technical/Management and Price/Cost factors were weighted approximately the same and, taken individually, were "significantly more important" than the Past Performance factor.  Id. at 271. However, the Technical/Management and Past Performance factors, when combined, were "more important" than the Price/Cost factor.  Id.

According to the Source Selection Plan, in evaluating the proposals, the Army planned to assign adjectival ratings to each of the elements in the Technical/Management factor reflecting the extent that each proposal would "result in effective and efficient performance" of the contract.  Id. at 1435-38.  An "outstanding" rating indicated complete confidence in that result, a "highly satisfactory" rating indicated high confidence in that result, a "satisfactory" rating indicated reasonable confidence in that result, a "marginal" rating indicated that the proposal might have that result, and an "unsatisfactory" rating indicated that the proposal was unlikely to have that result.  Id.; see also id. at 1436 (noting that an "outstanding" rating for the Labor element reflected complete confidence that the proposed "labor mix, composition of directly charged hours, education, experience, and training" would "result in effective and efficient performance").  The Army would also assign adjectival ratings for the Past Performance factor indicating its level of doubt that the offeror could "successfully accomplish[]" the work.  Id. at 1438.  A "high" rating indicated significant doubt, a "medium" rating indicated some doubt, a "low" rating indicated little doubt, and an "unknown" rating indicated that there was no relevant past performance or experience upon which to issue a rating.  Id. at 1440.

A Technical Evaluation Committee, appointed by the Source Selection Authority, would evaluate the offerors' proposals.  Id. at 1428, 1431.  The committee consisted of personnel with "a blend of technical, operational, and acquisition skills" who could provide "a thorough evaluation of the contractor technical proposals in accordance with the [SOW] and [the] source selection plan."  Id. at 1428.  Per the Source Selection Plan, the committee's findings were to be the basis for the source selection decision.  Id. at 1432.  Neither the Technical Evaluation Committee nor the Source Selection Authority were permitted to adjust those findings so that they would better fit an adjectival rating definition.  Id.

Three elements of the Technical/Management factor are of particular importance in this protest.  The first of these is the Labor element.  To assist in the Army's evaluation, offerors were required to provide the following information in their proposals:

> (a)  The labor mix (i.e. job categories and hours assumed for each) for the SOW as a whole.

> (b)  Minimum and proposed levels of education, training and experience.

> (c)  . . . [E]ach labor category and number of employees per category utilized to calculate the proposed direct labor dollars . . . .

> (d)  . . . [A] statement of minimum job qualifications/standards for each labor category proposed.  . . .

> (e)  . . . [R]esumes for each individual proposed for the following labor categories (or related contractor category).  For individuals not presently employed, letters of commitment shall be included.

>> (a)  Base/Program Manager
>> (b)  Target System Supervisor/Leader
>> (c)  Mechanic
>> (d)  Avionics Technician
>> (e)  TTCS Operator and Remote Control Supervisor

Id. at 267.  The offerors were also required to report "the total number of personnel proposed" for each labor category described in the RFP, the total number of personnel proposed for labor categories other than the ones described in the RFP, and "the total number of personnel proposed to perform the requirements of the SOW."  Id.  In evaluating the Labor element, the Army would examine "[e]vidence of the availability of sufficient personnel with the required skills, experience, and of the proposed labor mix to assure effective and efficient performance."  Id. at 270.

Also of importance are two elements of the Management subfactor.  Under the Management Approach element, the offerors were required to describe their plan "for organizing, staffing, directing and controlling the work to be performed," id. at 268, and would be evaluated for the "overall efficacy" of their proposed approaches, id. at 271.  Under the Participation by Small, Minority, and Disadvantaged Businesses element, the offerors were required to submit a participation plan for such businesses, id. at 268, and would be evaluated on the extent of such businesses' participation, including, among other things, the extent that such businesses were explicitly identified, id. at 271.

The RFP provided that the contract would be subject to the Service Contract Act of 1965. Id. at 237 (incorporating Federal Acquisition Regulation ("FAR") 52.222-41). Accordingly, the successful offeror would be required to pay its service employees performing under the contract a minimum amount of wages and fringe benefits, as specified in the relevant wage determination. FAR 52.222-41(c)(1). The relevant wage determination for the contract was identified in the RFP, which set forth FAR 52.222-42, Statement of Equivalent Rates for Federal Hires, as a contract clause. AR 237. In the original RFP, the clause included the following language: "Reference Wage Determination No. 05-2512, Revision 11, Dated 9/11/2009." Id. at 126. However, the referenced wage determination did not reflect the fact that personnel working under the incumbent contract had joined a union and were covered by a collective bargaining agreement ("CBA"). Id. at 64.

Kratos and Local Lodge 2515 of the International Association of Machinists and Aerospace Workers executed the CBA in June 2010, and it was to remain in effect from April 2010 to April 2013. Id. at 138, 164-65. On August 5, 2010, Kratos, which earlier that morning had received notice that the Army intended to extend its contract by five or six months, provided a copy of the CBA to the Army. Id. at 1393, 1423. Thus, on September 9, 2010, the Army issued Amendment 3 to the RFP to substitute a reference to a new wage determination, amending the relevant clause in the RFP to provide: "Reference Wage Determination No. 10-0110, Revision 1, Dated 8/17/2010." Id. at 125-26, 237. The new wage determination, which was made an attachment to the RFP, provided that in accordance with the Service Contract Act, "employees employed by the contractor(s) in performing services covered by the collective bargaining agreement(s) [were] to be paid wage rates and fringe benefits set forth in the current collective bargaining agreement and modified extension agreement(s)." Id. at 137. The CBA was included as part of the new wage determination. Id. at 138-66. Then, approximately two weeks after issuing Amendment 3, the Army issued Amendment 4 to the RFP, specifying that revision 13 of Wage Determination 05-2512, dated June 21, 2010, would apply to those labor categories not covered by the newly substituted wage determination. Id. at 167-68. The Army, in changing the wage determinations applicable to the contract in Amendments 3 and 4, did not change any related proposal requirements or evaluation criteria. Id. at 126, 168. It did, however, allow the offerors to submit revised proposals. Id.

## B.  Initial Evaluation of Proposals

Three offerors–SA-TECH, Kratos, and [. . .]–submitted proposals in response to the original RFP and revised proposals in response to Amendments 3 and 4. Id. at 1999-2000. Upon evaluating Kratos's proposal, the Technical Evaluation Committee assigned ratings of "outstanding" for the Technical/Management factor, both of its subfactors, the Labor element, and the Management Approach element, and a rating of "highly satisfactory" for the Participation by Small, Minority, and Disadvantaged Businesses element. Id. at 1765-68. For [. . .] proposal, the committee assigned ratings of "highly satisfactory" for the Technical/Management factor, the Technical subfactor, and the Labor element, and "outstanding" for the Management subfactor and all of its elements. Id. at 1769-72. And, with respect to SA-TECH's proposal, the

committee assigned ratings of "satisfactory" for the Technical/Management factor and the Technical subfactor, and "outstanding" for the Management subfactor and all of its elements. Id. at 1775-78. The two "satisfactory" ratings for SA-TECH's proposal were based on a "marginal" rating for the Labor element, due to the committee's concerns about the lack of resumes and lack of demonstrated experience on certain Targets Management Office ("TMO") operational systems. Id. at 1776-77. The committee recommended a discussion issue for SA-TECH related to these concerns. Id. at 1774.

Based on the findings of the Technical Evaluation Committee, past performance evaluations, and the total price proposed by each of the offerors, all three offerors were included in the competitive range. Id. at 1494-97. Subsequently, the Army sent discussion issues to each offeror. Id. at 2000. SA-TECH, in response to its discussion issues, supplied the missing resumes and explained the extent to which its "proposed personnel [had] demonstrated experience with all the TMO target systems or other closely related sub-scale aerial target systems." Id. at 1299-1300. After discussions were closed, the Army requested final proposal revisions from the offerors. Id. at 193-94.

## C. Final Evaluation of Proposals

The Technical Evaluation Committee reviewed the submitted final proposal revisions and announced its findings in a Final Evaluation Report. Id. at 2000. Based on SA-TECH's discussion responses, the committee increased SA-TECH's Technical/Management factor, Technical subfactor, and Labor element ratings to "outstanding." Id. at 1373-74. In its evaluation of SA-TECH's proposal's Labor element, the committee's analysis included the following:

[. . .]

Id. at 1374-75. The committee made no adjustments to the "outstanding" rating it assigned to Kratos's proposal for the Labor element.[3] Id. at 866-67.

In its evaluation of the proposals under the Management subfactor, the Technical Evaluation Committee discussed the individual proposed by the offerors to serve as the base manager.[4] For SA-TECH's proposal, it noted:

[. . .]

---

[3] The administrative record does not contain the portion of the Final Evaluation Report that addresses [. . .] final proposal revision.

[4] The Source Selection Authority considered these comments under the Management Approach element in her source selection decision.

Id. at 1375.  For Kratos's proposal, it remarked:

[. . .]

Id. at 863.  The committee assigned "outstanding" ratings to both SA-TECH and Kratos for the Management subfactor.  Id. at 863, 1375.  Finally, for the Participation by Small, Minority, and Disadvantaged Businesses element, the Technical Evaluation Committee continued to rate SA-TECH's proposal as "outstanding" and Kratos's proposal as "highly satisfactory."  Id. at 864, 1376.

### D.  Source Selection Decision and Contract Award

After the Technical Evaluation Committee submitted its Final Evaluation Report, the Source Selection Authority prepared a Source Selection Decision Memorandum.  Id. at 1999-2000.  Based on "the factors and sub-factors established in the subject solicitation," her "integrated assessment of the proposals submitted in response to the solicitation," and her "review of the applicable facts and the collective judgment, recommendations, and evaluations performed by the Technical Evaluation Committee," the Source Selection Authority concluded that SA-TECH's proposal provided "the best overall value to satisfy the Army's need."  Id. at 1999.  She then set forth, in great detail, her evaluation of the proposals.

As part of her evaluation, the Source Selection Authority described the Army's adjectival ratings for each subfactor and element under the Technical/Management factor.[5]  Id. at 2004, 2007.  She indicated that all three offerors' proposals received "outstanding" ratings for each subfactor and element under the Technical/Management factor except the Participation by Small, Minority, and Disadvantaged Businesses element, for which each proposal received a "satisfactory" rating.  Id.  She then explained that for the Past Performance factor, the Performance Risk Assessment Group assigned "low" ratings to all three offerors, indicating that there was little doubt that they could successfully perform the contract.  Id. at 2012.  She further reported the "proposed/evaluated price/cost" of each offeror along with the Army's estimated cost: SA-TECH's proposed price was $26,980,807, [. . .] proposed price was [. . .], Kratos's proposed price was [. . .], and the Army's estimated cost was $31,719,556.  Id. at 2013.

The Source Selection Authority's adjectival ratings were accompanied by narrative comments.  Of importance here are certain comments she provided for three of the elements under the Technical/Management factor.  For the Labor element, she discussed the experience of the personnel proposed for the contract.  Addressing Kratos's proposal, she remarked: "As the incumbent contractor, Kratos/WSS has inherent advantages, one of which is the personnel with the specific experience on the TMO target systems.  Kratos/WSS has proposed their current

---

[5]  The Source Selection Authority did not report any ratings for the Technical/ Management factor overall.

employees under this follow-on requirement, allowing for continuity of services without impact of learning curve." Id. at 2005.  Then, addressing SA-TECH's proposal, she noted:

> [. . .]

Id. at 2005-06.

Also of importance are the Source Selection Authority's comments regarding the Management Approach element.  For both SA-TECH and Kratos, she reiterated the Technical Evaluation Committee's comments concerning the proposed base managers.  Id. at 2007, 2009. And, in her comments on the Participation by Small, Minority, and Disadvantaged Businesses element, she summarized the findings of the Office of Small Business Programs and assigned "satisfactory" ratings to both proposals.  Id. at 2007-08, 2010.  In particular, with respect to SA-TECH's proposal, she noted that SA-TECH did not specifically identify any small, minority, or disadvantaged businesses, but found that this failure was offset by its proposal to have such businesses perform specified services and provide specified materials.  Id. at 2010.

After discussing the offerors' proposals, the Source Selection Authority engaged in a tradeoff analysis.  Id. at 2013-14.  She concluded that there were "no meaningful distinctions between the non-cost portions of the proposals . . . ." Id. at 2013.  Expanding on her conclusion, she indicated that SA-TECH had a minor weakness in the Participation by Small, Minority, and Disadvantaged Businesses element and that Kratos was the only offeror with no weaknesses.  Id. Then, with respect to the experience levels of the personnel proposed by SA-TECH and Kratos, she explained:

> [. . .]

Id. at 2014.  She further remarked that "SA-TECH proposed to maximize efficiency and workforce productivity" through the supplementation of contract personnel with personnel from its other contracts and that SA-TECH's approach was "geared towards creating a more productive, cost-effective work-force at an overall lower cost to the Government."  Id. Accordingly, the Source Selection Authority determined that the "price/cost advantages of SA-TECH's proposal outweigh[ed] the possibility of a learning curve impact," id. at 2013, and concluded:

> Based on the evaluation criteria and basis for award, SA-TECH's overall outstanding technical/management rating and the lowest proposed/evaluated price/cost[] provides the Government with complete confidence for an effective and efficient performance with a low degree of risk.
>
> Therefore, [SA-TECH] is determined to offer the best value to the Government for the base and all options, in the amount of $26,980,807.

Id.  The Army awarded the contract to SA-TECH on February 1, 2011, and notified the unsuccessful offerors that same day.  Id. at 1501-06.  The award notification letters disclosed the contract award price, which was the price offered by SA-TECH in its final proposal revision.  Id. at 1504, 1506.  The letters also revealed the adjectival ratings for the proposals of both the unsuccessful offeror and SA-TECH for the Technical/Management subfactors and Past Performance factor.  Id.  Thus, Kratos discovered SA-TECH's proposed price and that both Kratos's and SA-TECH's proposals received "outstanding" ratings for the Technical/ Management subfactors and a "low" rating for the Past Performance factor.  Id. at 1504.

### E.  Kratos's GAO Protest

Upon its timely request, Kratos received a debriefing from the Army regarding the contract award on February 17, 2011.  Id. at 1509.  Five days later, Kratos filed a protest with the GAO.  Id. at 1508.  It argued that the Army, by issuing Amendment 3, added a new requirement to the RFP, in that offerors were required to propose a labor mix in compliance with the CBA. Id. at 1510.  It alleged that the Army failed to consider the offerors' compliance with the CBA when evaluating their proposed labor mixes and that SA-TECH should have received a lower Technical/Management rating than Kratos because SA-TECH, which did not submit any resumes or letters of commitment from members of the union, could not have proposed the labor mix required by the CBA.  Id. at 1509, 1512-13.

The Army requested that the GAO dismiss Kratos's protest, arguing generally that Amendment 3 did not contain any language indicating that it substantively changed the RFP to mandate the labor categories or purported labor mix set forth in the CBA.  Id. at 1779.  It offered three specific grounds for dismissal.  Id. at 1781-83.  First, it contended that the protest was untimely because Kratos alleged a defect in the RFP introduced by an amendment, and prospective offerors alleging such a defect must file a protest before the proposal due date following the incorporation of the amendment.  Id. at 1781-82.  Second, it asserted that Kratos was not an interested party because Kratos was not the next offeror in line to receive the contract if the GAO sustained the protest.  Id. at 1782.  Third, it argued that Kratos did not state a valid ground for protest because Amendment 3 did not introduce a new requirement into the RFP.  Id. at 1782-83.

After reviewing the Army's dismissal request, the GAO attorney assigned to the protest found that the Army's interested party argument lacked merit.  Id. at 1915.  Then, with respect to the Army's other two arguments, he stated:

> If the solicitation mandated that offerors adopt the labor mix contained in the collective bargaining agreement (CBA), the protester has timely protested that the agency failed to evaluate offerors in accordance with that requirement. However, if the solicitation does not contain the requirement that offerors adopt the labor mix contained in the CBA, then the agency is correct that the allegation

that the agency failed to evaluate proposals on whether they satisfied that nonexistent requirement does not state a valid basis of protest.

Id.

Kratos responded to the Army's dismissal request, advancing two arguments. Id. at 1916. First, it asserted that its protest was timely because it was not contending that the RFP was ambiguous, but that the RFP contained a requirement ignored by the Army. Id. Second, it argued that it met the minimum standard for protest: that its grounds were legally sufficient. Id. at 1917. The GAO attorney ultimately denied the Army's request for dismissal, without elaboration. Id. at 1920. The day after the denial, SA-TECH requested permission to intervene in the protest and the entry of a protective order. Id. at 1660.

The Army issued a stop-work order on the contract on March 22, 2011. Id. at 1667. Thereafter, it provided the GAO, Kratos, and SA-TECH with the required agency report, which included a statement from the contracting officer, a legal memorandum, and documents related to the procurement such as the Technical Evaluation Committee's Final Evaluation Report and the Source Selection Decision Memorandum. Id. at 1921, 1971-73. The principal argument advanced by the Army was that the CBA "did not contain a labor skill mix, but rather a handful of labor categories and prevailing rates," and was only added to the RFP "to provide prevailing wage rates," not to change the RFP's "evaluation criteria . . . ." Id. It therefore requested that the GAO deny the protest. Id. at 1923.

After receiving the Army's report, the GAO attorney advised the parties that he was "dubious that the labor mix required under the CBA was incorporated into the RFP, but if Amendment 3 created a patent ambiguity, then the protest [was] likely untimely, and [the GAO] would not reach the merits of the allegations." Id. at 1939. The GAO attorney invited SA-TECH and Kratos to address the issue in their comments on the Army's report. Id.

SA-TECH responded to the Army's report on April 4, 2011, contending that Kratos incorrectly interpreted Amendment 3 to incorporate the CBA into the RFP. Id. at 1670. Amendment 3, SA-TECH asserted, merely referenced the new wage determination and underlying CBA to establish minimum wage and fringe benefit amounts for certain, specified labor categories. Id. SA-TECH argued that the protest was both untimely and meritless, and that Kratos did not demonstrate any competitive prejudice. Id. at 1671. It therefore requested that the GAO dismiss or deny the protest. Id. at 1670.

Kratos also responded to the Army's report on April 4, 2011. Id. at 1689. It agreed that the outcome of its protest turned on whether Amendment 3 to the RFP, by including the CBA, affected the labor mix proposed by the offerors and evaluated by the Army. Id. at 1702. Contending that the inclusion of the CBA did affect the RFP's requirements regarding the labor mix for the contract, it again argued that the Army did not properly evaluate the offerors'

proposed labor mixes and that SA-TECH's proposal should have been rated lower than its own. Id. at 1703-06. In addition, Kratos's response included a new ground for protest based on the materials submitted with the Army's report ("supplemental protest"). Id. at 1689-91. It alleged that the Army's "systematic process of assigning an 'Outstanding' rating to every Factor for each bidder, regardless of the evaluator's comments and plain language of the proposals," improperly converted the "best-value determination into a lower-price, technically acceptable evaluation." Id. at 1689. In particular, it contrasted the Technical Evaluation Committee's assignment of an "outstanding" rating to SA-TECH's proposal under the Labor element with the Technical Evaluation Committee's comments highlighting its concern with SA-TECH's proposal. Id. at 1690. It also contended that SA-TECH's proposal's "outstanding" rating for the Management subfactor was inappropriate, given the [. . .] proposed by SA-TECH. Id. at 1700. Finally, it asserted that SA-TECH's proposal improperly received an "outstanding" rating for the Participation by Small, Minority, and Disadvantaged Businesses element given SA-TECH's failure to identify specific businesses.[6] Id. at 1701-02.

After receiving and reviewing the responses to the Army's report, the GAO attorney informed the parties on April 7, 2011, that he was "interested in whether, in light of the protester's challenges to the agency's technical evaluation, the agency [was] more inclined to continue to defend the protest or take corrective action." Id. at 1940. Upon SA-TECH's inquiry, he explained that he intended "to suggest . . . that, on the face of it, the protester offer[ed] a straight forward argument as to why the agency's evaluation of the technical portions of the proposals was unreasonable." Id. at 1941. He elaborated that based on his experience, "an early indication of that assessment . . . [could] assist an agency in determining appropriate next steps," and that while some agencies proceeded to successfully defend their awards, "more frequently," agencies "shared [the GAO's] concern and responded accordingly." Id.

SA-TECH responded to Kratos's supplemental protest on April 11, 2011. Id. at 1944. It contended that the supplemental protest actually contained two new grounds–the Army's alleged improper evaluation of proposals and the Army's purported conversion of a best-value procurement into a lower-price, technically acceptable procurement. Id. at 1944-45. It then advanced four arguments. First, it argued that the supplemental protest in its entirety was untimely because Kratos knew the factual basis of its new allegations more than ten days before it asserted them in response to the Army's report. Id. at 1945. It also contended that Kratos was not an interested party with respect to its allegation that the Army improperly evaluated the proposals because Kratos was not next in line for contract award. Id. at 1945-46. Third, it asserted that Kratos's allegation that the Army improperly converted the protest was based on pure speculation. Id. at 1944, 1946. Finally, it argued that Kratos did not plead or establish competitive prejudice with respect to either aspect of its supplemental protest. Id. SA-TECH therefore requested that the GAO dismiss the supplemental protest. Id. at 1962.

---

[6] As noted above, SA-TECH ultimately received a "satisfactory" rating on this element in the Source Selection Decision Memorandum.

Later that day, the GAO attorney invited Kratos to respond to SA-TECH's dismissal request and the Army to respond "only" to Kratos's April 4, 2011 comments regarding the initial protest. Id. at 1974. In its response, the Army reiterated its position that the protest should be denied. Id. at 1991-93. Kratos, in its response, first emphasized that it was only asserting one supplemental ground for protest–that the Army's ratings and analysis were irreconcilable–and that SA-TECH failed to address that ground. Id. at 1977. Second, it contended that its supplemental protest both satisfied the dismissal standard and gave the GAO "sufficient reason" to sustain its protest. Id. More particularly, Kratos indicated that it could not have known about the discordance between the ratings and analysis until it received the Army's report, that it was unquestionably an interested party, and that the Army's improper evaluation was obviously prejudicial to it. Id. at 1977-78. Kratos accordingly requested that SA-TECH's dismissal request be denied. Id. at 1989.

In an April 20, 2011 electronic-mail message sent to all of the parties, the GAO attorney addressed Kratos's supplemental protest:

> The agency rated the awardee Outstanding under the Labor element . . . . This rating seems unreasonable, given the definition of Outstanding and the concerns expressed by the agency.
>
> We need not resolve the issue of whether that evaluation was reasonable or whether the protester timely challenged it, given the deficiencies in the source selection decision memorandum. The [memorandum] stated that "there are no meaningful distinctions between the non-cost portions of the proposals." To substantiate this claim the [memorandum] recounted as follows: The main difference between the two offerors was that the protester had the incumbent work force under its employ and proposed them; the now-awardee "mitigat[ed]" this advantage [. . .] personnel and by stating that they have a [. . .] on newly awarded contracts. These statements do not accurately reflect the agency's final evaluation report, which, in often-quot[ed] language, says that the awardee [. . .] but there is no guarantee of success, as evidenced by the lack of letters of commitment, and goes on to express considerable concern with the awardee's proposal. The source selection fails to acknowledge and appreciate the concerns expressed in the evaluation of the Labor element, which serves as a key discriminator between the proposals. That the two proposals were rated the same for this element is highly irrelevant; regardless of ratings, the source selection must look behind those ratings to consider the distinctions uncovered in the evaluation. This source selection document fails to do that.
>
> Had the agency said, we recognize the value of incumbency and the advantage of the reduced risk in the incumbent's proposal, but that advantage is not worth the premium over the awardee's proposal, we would in all likelihood deny a challenge to the best value trade-off. Those are not the facts here. Here,

the agency denied that there were proposal discriminators–documented in its evaluation–and there was a trade-off to be made between, on the one hand, an incumbent who guaranteed to deliver an experienced work force, and, on the other, a lower-priced offeror who did not and about whom the agency expressed reservations.  We would likely sustain the protest on that ground.

Id. at 1995 (third alteration in the original) (emphasis added) (citations omitted).

### F.  Proposed Corrective Action

The Army initially responded to the electronic-mail message that same day, indicating that the GAO attorney's "discussion" was "clear" and that it did not anticipate "request[ing] outcome prediction."  SAR 1.  Then, in a letter dated April 22, 2011, the Army informed the GAO that it intended to take corrective action:

On February 22, 2011, Kratos . . . filed their initial protest challenging the Army's award to [SA-TECH] for aerial target flight operations and maintenance services.  The initial protest alleged that the Army should have evaluated the Technical/Management Factor in accordance with the "labor mix" incorporated in Kratos' [CBA].  On April 4, 2011, Kratos filed a supplemental protest alleging that the Army inappropriately rated SA-TECH's Technical/Management proposal as Outstanding and converted the best value determination into a low price/technically acceptable evaluation.

After a review of the supplemental issues, the Army has determined that it is in its best interest to take corrective action.  The Army intends to terminate the contract awarded to SA-TECH so that it can reopen the original solicitation.  The solicitation will then be amended to explain the intention of providing Kratos' CBA in the solicitation.  If after the amendment is issued [and] the offerors wish to, they may revise their technical and cost proposals.  The technical and cost proposals will be evaluated and, if necessary, the Agency reserves the right to conduct discussions.  A new source selection decision will then be executed and announced.

AR 1996-97.  The Army therefore requested that the GAO dismiss Kratos's protest.  Id. at 1997. The GAO dismissed the protest on April 25, 2011.[7]  Id. at 1998.

SA-TECH filed this protest on May 4, 2011, challenging the Army's proposed corrective action.  In its first claim for relief, SA-TECH contends that the Army's decision to take

_____

[7]  During oral argument, defense counsel reaffirmed the Army's intention to take the corrective action that it described in its letter to the GAO and that caused the GAO to dismiss Kratos's protest.

corrective action is arbitrary, capricious, and unreasonable because the decision is based on an electronic-mail message from a GAO attorney that is itself unreasonable. Compl. ¶¶ 69-79. Accordingly, it requests that the court declare that (1) the contents of the GAO attorney's electronic-mail message and the Army's decision to take corrective action in response to the message are "arbitrary and capricious and contrary to precedent, unwarranted, and overbroad" and (2) its contract with the Army is "valid and not subject to corrective action" based on the GAO protest. Id. ¶ 79. In its second claim for relief, SA-TECH contends that the Army's proposed corrective action lacks a rational basis and involves a violation of law, regulation, or procedure. Id. ¶¶ 80-87. Accordingly, it requests that the court declare that (1) the Army's decision to take corrective action is "arbitrary and capricious and contrary to precedent, unwarranted, and overbroad" and (2) its contract with the Army is "valid and not subject to corrective action . . . ." Id. ¶ 87.

In addition, under both claims for relief, SA-TECH requests that the court enjoin the Army from terminating its contract with SA-TECH and taking further corrective action, whether it is the action proposed by the Army in its April 22, 2011 letter or some other corrective action. Id. ¶¶ 79, 87. And, in the event that the court concludes that corrective action is appropriate, SA-TECH requests that the court declare that the Army's proposed amendment to the solicitation and invitation to submit revised proposals is "arbitrary and capricious, contrary to precedent, unwarranted, and overbroad" and enjoin the Army from amending the solicitation and inviting revised proposals. Id. The Army has stayed the implementation of its proposed corrective action pending this protest.

Now before the court are the United States' and Kratos's motions to dismiss for lack of jurisdiction and the parties' cross-motions for judgment on the administrative record. The court heard argument on the motions on August 3, 2011.

## II.  THE MOTIONS TO DISMISS

As an initial matter, United States and Kratos contend that the United States Court of Federal Claims ("Court of Federal Claims") lacks jurisdiction to entertain SA-TECH's protest, arguing that the court's bid protest jurisdiction does not extend to claims related to a procuring agency's proposed corrective action. In ruling on a motion to dismiss, the court generally assumes that the allegations in the complaint are true and construes those allegations in the plaintiff's favor. Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). However, if a defendant challenges the factual basis of the court's jurisdiction, contested allegations in the complaint are not controlling. Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583 (Fed. Cir. 1993). Rather, the plaintiff must come forward with a preponderance of evidence in support of its jurisdictional allegations. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936). The court may therefore look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction. Land v. Dollar, 330 U.S. 731, 735 & n.4 (1974). If the court finds that it lacks subject matter jurisdiction over a claim, Rule 12(h)(3) of the Rules of the United States Court of Federal Claims ("RCFC") requires the court to dismiss that claim.

**A. The Court of Federal Claims Possesses Jurisdiction Under 28 U.S.C. § 1491(b)(1) to Consider SA-TECH's Protest**

Whether the court has jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time.  Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir. 2004).

The ability of this court to hear and decide suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued."  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).  The Tucker Act, the principal statute governing the jurisdiction of the Court of Federal Claims, waives sovereign immunity for claims against the United States in bid protests.[8]  See 28 U.S.C. § 1491(b) (2006). Specifically, the Tucker Act provides that the Court of Federal Claims:

> shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded.

Id. § 1491(b)(1).

SA-TECH contends that the court has jurisdiction to entertain its protest because it is "objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract

---

[8]  Prior to 1982, the predecessor of the Court of Federal Claims exercised jurisdiction over preaward bid protests under the Tucker Act's waiver of sovereign immunity for claims based on implied contracts with the United States.  Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1331 (Fed. Cir. 2001).  Relief was limited to money damages. Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1331.  The court's ability to grant declaratory and injunctive relief in preaward bid protests was added to the Tucker Act in section 133 of the Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, 96 Stat. 25, 39-40. Jurisdiction over postaward bid protests was added to the Tucker Act in section 12 of the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, 1110 Stat. 3870, 3874-76.

. . . ." The court agrees.  As an initial matter, the body of decisional law addressing challenges to a procuring agency's corrective action reflect that the bid protest jurisdiction of the Court of Federal Claims under 28 U.S.C. § 1491(b)(1) should be broadly construed.  Some of these decisions concern corrective action that the procuring agency actually implemented; in other words, the contract was suspended or terminated, or the competition was reopened.  In each of these protests, the deciding court either found or assumed that the Court of Federal Claims possessed subject matter jurisdiction.[9]  Other decisions concern corrective action that the procuring agency proposed, but had not yet implemented.[10]  In all but two of the protests, the courts once again explicitly ruled that the Court of Federal Claims possessed subject matter jurisdiction or implicitly made such a ruling by addressing the parties' arguments and rendering a

---

[9]  See, e.g., Turner Constr. Co. v. United States, No. 2010-5146, 2011 WL 2714137 (Fed. Cir. July 14, 2011); Centech Grp., Inc. v. United States, 554 F.3d 1029 (Fed. Cir. 2009); Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934 (Fed. Cir. 2007); Roxco, Ltd. v. United States, 185 F.3d 886 (Fed. Cir. 1999) (unpublished table decision); Jacobs Tech. Inc. v. United States, Nos. 11-180C, 11-190C, 2011 WL 3100353 (Fed. Cl. June 8, 2011) (merits), 2011 WL 2044581 (Fed. Cl. May 26, 2011) (jurisdiction); Sheridan Corp. v. United States, 95 Fed. Cl. 141 (2010); Turner Constr. Co. v. United States, 94 Fed. Cl. 561 (2010), aff'd, 2011 WL 2714137; Ceres Gulf, Inc. v. United States, 94 Fed. Cl. 303 (2010); Centech Grp., Inc. v. United States, 79 Fed. Cl. 562 (2007) (merits), aff'd, 554 F.3d at 1029; Centech Grp., Inc. v. United States, 78 Fed. Cl. 496 (2007) (jurisdiction); Chapman Law Firm Co. v. United States, 71 Fed. Cl. 124 (2006), aff'd in part, rev'd in part sub nom. 490 F.3d at 934; MCII Generator & Electric, Inc. v. United States, No. 1:02-CV-00085-LMB, 2002 WL 32126244 (Fed. Cl. Mar. 18, 2002); Griffy's Landscape Maint. LLC v. United States, 51 Fed. Cl. 667 (2001); Cal. Marine Cleaning, Inc. v. United States, 42 Fed. Cl. 281 (1998).

[10]  Two of these protests predate the 1996 enactment of the ADRA.  See Firth Constr. Co. v. United States, 36 Fed. Cl. 268 (1996); IMS Servs., Inc. v. United States, 32 Fed. Cl. 388 (1994).  As noted above, prior to the enactment of the ADRA, the Tucker Act's waiver of sovereign immunity for suits against the United States based on express or implied contracts was construed "to authorize suits by disappointed bidders challenging contract awards based on alleged improprieties in the procurement process."  Res. Conservation Grp., LLC, 597 F.3d at 1242.  The ADRA amended the Tucker Act–deleting the language concerning the relief available in preaward bid protests and adding language addressing both preaward and postaward bid protests–to establish the bid protest jurisdiction of the Court of Federal Claims in its current form.  See § 12(a), 1110 Stat. at 3874-76.  Due to the significant change in statutory language, Firth Construction Co. and IMS Services, Inc. provide little guidance as to the court's current bid protest jurisdiction.  Nevertheless, these decisions reflect the fact that the Court of Federal Claims exercised jurisdiction over challenges to proposed, but not implemented, corrective action even under a more restrictive jurisdictional provision.

merits-based decision.[11]  And, neither of the decisions in which the Court of Federal Claims concluded that it lacked jurisdiction to entertain the protest addressed jurisdiction under the first prong of section 1491(b)(1).  See Outdoor Venture Corp. v. United States, No. 11-353C, 2011 WL 3100343, at *5-9 (Fed. Cl. July 25, 2011) (concluding that it lacked jurisdiction over the contract awardee's claim that the procuring agency would likely terminate its contract as a result of a successful size protest because (1) the awardee lacked standing under section 1491(b)(1) and (2) the decision to reopen a size determination was in the sole discretion of the Small Business Administration ("SBA")); Data Monitor Sys., Inc. v. United States, 74 Fed. Cl. 66, 72-73 (2006) (concluding that it lacked jurisdiction under section 1491(b)(1), but focusing exclusively on the fourth prong of the statute).  The decisional law therefore suggests that the Court of Federal Claims possesses jurisdiction to entertain a variety of challenges relating to a procuring agency's corrective action.

Indeed, the Court of Federal Claims possesses jurisdiction to resolve a broad range of disputes that may occur during the procurement process.  On its face, 28 U.S.C. § 1491(b)(1) grants the court the authority to consider both preaward and postaward bid protests, and within those two all-encompassing categories, its language is expansive.  The court may entertain objections to a solicitation, objections to a proposed award, objections to an award, objections related to a statutory or regulatory violation in connection with a procurement, and objections related to a statutory or regulatory violation in connection with a proposed procurement. Moreover, when Congress enacted the ADRA, there is no question that its intent was to consolidate the bid protest jurisdiction exercised by the federal courts, after a four-year period, with the Court of Federal Claims' preaward bid protest jurisdiction so that there would be but one judicial forum for all protests.[12]  See Res. Conservation Grp., LLC, 597 F.3d at 1242-43; Emery Worldwide Airlines, Inc., 264 F.3d at 1079-80; see also H.R. Rep. No. 104-841, at 10 (1996) (Conf. Rep.) (explaining that the amendment to section 1491 would "consolidate[] federal court jurisdiction for procurement protest cases in the Court of Federal Claims" and that it was the intention of the conference committee "to give the Court of Federal Claims exclusive jurisdiction over the full range of procurement protest cases previously subject to review in the

---

[11]  See, e.g., ManTech Telecomms. & Info. Sys. Corp. v. United States, 30 F. App'x 995 (Fed. Cir. 2002) (unpublished per curiam decision); Madison Servs., Inc. v. United States, 90 Fed. Cl. 673 (2010) (dismissing intended awardee's initial claims as unripe and moot but making no ruling on subject matter jurisdiction under 28 U.S.C. § 1491(b)(1), and permitting intended awardee to pursue supplemental claims); Aeolus Sys., LLC v. United States, 79 Fed. Cl. 1 (2007); Delaney Constr. Co. v. United States, 56 Fed. Cl. 470 (2003); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57 (2001), aff'd per curiam, 30 F. App'x at 995.

[12]  For a discussion of the bid protest jurisdiction exercised by the federal courts before the enactment of the ADRA, see Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1083 n.11 (Fed. Cir. 2001).

federal district courts and the Court of Federal Claims"[13]); 142 Cong. Rec. H12277 (daily ed. Oct. 4, 1996) (statement of Rep. Maloney) (noting that a compromise provision allowed for concurrent jurisdiction in the federal district courts and the Court of Federal Claims for four years); 142 Cong. Rec. S11848 (daily ed. Sept. 30, 1996) (statement of Sen. Cohen) (stating that the amendment to section 1491 would "expand the bid protest jurisdiction of the Court of Federal Claims" and would eventually eliminate "forum shopping" and create "national uniformity"). In other words, after four years, the exclusive judicial forum for bid protests would be the Court of Federal Claims.

In this case, SA-TECH, as the contract awardee, is challenging the Army's decision to take corrective action. Even though SA-TECH filed suit before the Army acted on its plan to take corrective action by terminating SA-TECH's contract and reopening competition, there is no dispute that, absent this suit, the Army would proceed with its plan. The jurisdictional grant in 28 U.S.C. § 1491(b)(1) applies to the entire procurement process. See Res. Conservation Grp., LLC, 597 F.3d at 1245 ("1491(b)(1) in its entirety is exclusively concerned with procurement solicitations and contracts."). And, the corrective action proposed by the Army is unquestionably part of its process for procuring aerial target flight operations and maintenance services. See id. at 1244 (noting that federal law defines "procurement" as including "'all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" (emphasis omitted) (quoting 41 U.S.C. § 403(2) (2006))). Indeed, it would be a waste of time, money, and energy for SA-TECH to wait until the Army actually began to implement its proposed corrective action to file suit. Therefore, the court concludes that the Tucker Act's bid protest jurisdiction is sufficiently broad to encompass SA-TECH's protest, and, more particularly, that SA-TECH is objecting to a solicitation for proposals for a proposed contract under the first prong of section 1491(b)(1).

The counterarguments advanced by the opposing parties are not persuasive. Both the United States and Kratos argue that the court lacks jurisdiction to adjudicate SA-TECH's challenge of the Army's decision to terminate their contract because such a claim must be brought under the Contract Disputes Act of 1978 ("CDA"). SA-TECH, however, is not merely challenging the Army's plan to terminate its contract; rather, it is challenging the entire scope of the Army's decision to take corrective action. The inclusion of contract termination as part of that plan does not divest the court of its bid protest jurisdiction. See Roxco, Ltd., 185 F.3d at 886 (rejecting the argument "that when the CDA aspect of a complaint is dominant, the court may not assume jurisdiction over those portions of the complaint that would otherwise arise under the court's bid protest jurisdiction" and holding that the existence of a potential CDA

---

[13] The provision concerning 28 U.S.C. § 1491 discussed in the conference report was ultimately enacted in an amended form that gave federal district courts and the Court of Federal Claims concurrent jurisdiction over bid protests for four years, after which time the Court of Federal Claims, in the absence of congressional action, would have exclusive jurisdiction. See 142 Cong. Rec. S11848 (daily ed. Sept. 30, 1996) (containing the text of the amendment to 28 U.S.C. § 1491 that was ultimately enacted).

claim "does not deprive the Court of Federal Claims of jurisdiction over its cause of action under the bid protest provision of the Tucker Act"); Griffy's Landscape Maint. LLC, 51 Fed. Cl. at 673-74 (holding that under its bid protest jurisdiction, it could not consider a challenge to contract termination, but it could consider the companion challenge to the reopening of competition); see also Turner Constr. Co., 2011 WL 2714137, at *9 (noting that "once jurisdiction attaches, the Court of Federal Claims has broad equitable powers to fashion an appropriate remedy," including the reinstatement of a contract award). Moreover, the Army has not yet terminated its contract with SA-TECH. See Roxco, Ltd., 185 F.3d at 886 (holding that because the Navy had not terminated the contract at the time the appellant filed suit, there was no jurisdiction under the CDA at that time). Therefore, the attempt to shoehorn SA-TECH's claims into the jurisdictional confines of the CDA are futile. See Sheridan Corp., 95 Fed. Cl. at 150 (rejecting the contention that a challenge of corrective action was "a challenge of the Government's ability to terminate a contract for convenience" and therefore "beyond the Court's jurisdiction," noting that the plaintiff was "not challenging some abstract ability of the Government to terminate for convenience–it [was] challenging the propriety of the Government's chosen corrective action in relation to the RFP"); Centech Grp., Inc., 78 Fed. Cl. at 507 (holding that the plaintiff was asserting a claim under the court's bid protest, not CDA, jurisdiction, noting that the plaintiff sought "to overturn preaward agency conduct in an ongoing procurement rescinding its original award and reopening discussions" and not "termination for convenience costs" or the reversal of a contracting officer's final decision). The United States further argues that, contrary to SA-TECH's contention, the court lacks jurisdiction under the fourth prong of 28 U.S.C. § 1491(b)(1) because SA-TECH has not alleged a violation of statute or regulation. Such an allegation is unnecessary, however, when a complaint, like SA-TECH's, falls within the first prong of section 1491(b)(1).

## B. Justiciability

In addition to urging that the court lacks jurisdiction to entertain SA-TECH's protest, the United States seeks the dismissal of SA-TECH's protest as nonjusticiable for lack of standing and as not ripe for judicial review. The court's jurisdictional and justiciability inquiries are distinct. Baker v. Carr, 369 U.S. 186, 198 (1962); Murphy v. United States, 993 F.2d 871, 872 (Fed. Cir. 1993). An issue is justiciable if it is within the court's competency to supply relief. Murphy, 993 F.2d at 872; see also Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005) (panel portion) (noting that justiciability "encompasses a number of doctrines under which courts will decline to hear and decide a cause," including the "doctrines of standing, mootness, ripeness, and political question"). The court may therefore find that it possesses jurisdiction over the subject matter of a case but that the dispute is nonjusticiable. Baker, 369 U.S. at 198; Oryszak v. Sullivan, 576 F.3d 522, 526 n.3 (D.C. Cir. 2009) ("That a particular dispute is nonjusticiable, however, does not mean the court lacks jurisdiction over the subject matter."). Having found that it possesses jurisdiction over the subject matter of SA-TECH's complaint, the court turns to the justiciability issues raised by the United States, beginning with the question of SA-TECH's standing.

### 1.  SA-TECH Has Standing to Protest

"[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  Warth v. Seldin, 422 U.S. 490, 498 (1975).  The standing inquiry involves both Article III "case or controversy" limitations on federal jurisdiction and "prudential limitations on its exercise."[14]  Id.  SA-TECH bears the burden of establishing its standing to protest.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

"The standing issue in this case is framed by 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III."  Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009).  Under section 1491(b)(1), bid protests may only be brought by "interested parties."  The term "interested party" is construed in accordance with the Competition in Contracting Act of 1984, and, accordingly, "standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A) (2000)); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (interpreting this standard as requiring a protester to show that it was an interested party prejudiced by the procuring agency's action and holding that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits"[15]); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370

---

[14]  Congress created the Court of Federal Claims under Article I of the United States Constitution.  28 U.S.C. § 171(a).  Courts established under Article I are not bound by the "case or controversy" requirement of Article III.  Zevalkink v. Brown, 102 F.3d 1236, 1243 (Fed. Cir. 1996).  However, the Court of Federal Claims and other Article I courts traditionally have applied the "case or controversy" justiciability doctrines in their cases for prudential reasons.  See id.; CW Gov't Travel, Inc. v. United States, 46 Fed. Cl. 554, 558 (2000); see also Anderson v. United States, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) ("The Court of Federal Claims . . . applies the same standing requirements enforced by other federal courts created under Article III.").

[15]  A protester must also demonstrate prejudice to succeed on the merits of its bid protest.  See Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").  The test for demonstrating prejudice at both the standing and merits stages of the protest is the same, but application of the test may yield different results due to the differing standards of review.  See L-3 Commc'ns Corp. v. United States, No. 10-538C, 2011 WL 1957681, at *5 (Fed. Cl. May 20, 2011) ("The difference between the two [prejudice standards] is that the prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true."); Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 244 (2011) ("[S]ince, for purposes of standing, prejudice must be analyzed before a merits

-20-

(Fed. Cir. 2002) (defining "prejudice" as "injury").  Therefore, SA-TECH must establish that it "(1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006).

There are two tests for demonstrating a direct economic interest.  In the preaward context, a protester must show "a 'non-trivial competitive injury which can be addressed by judicial relief.'"  Weeks Marine, Inc., 575 F.3d at 1362 (quoting WinStar Commc'ns, Inc. v. United States, 41 Fed. Cl. 748 (1998)).  In the postaward context, a protester must show that it had a "substantial chance" of receiving the contract.  Rex Serv. Corp., 448 F.3d at 1307.  In other words, "[t]o have standing, the plaintiff need only establish that it 'could compete for the contract' . . . ."  Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370 (quoting Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1334).

The United States argues that SA-TECH lacks standing to pursue its protest because "SA-TECH has yet to suffer any injury of any kind" and cannot "demonstrate a 'direct economic interest' in the Army's decision because no final contract award has been made, and SA-TECH continues to maintain the award and may ultimately retain the contract."  Def.'s Mot. 16.  The United States' position cannot be sustained.  SA-TECH unquestionably meets the first prong of the standing test because, as the current contract awardee, there is little doubt that it would be forced to compete for the contract for a second time once the Army reopens the competition–an action the Army intends to take, as represented to the GAO and this court.  SA-TECH has also shown, under the second prong, that it has a direct economic interest in the reopening of competition and reaward of the contract, regardless of whether its challenge to the Army's proposed corrective action is considered to be a preaward or postaward bid protest.  If the Army implements its proposed corrective action, SA-TECH would be forced to recompete for a contract it has already won, and its competitors would have the advantage of knowing its original proposed price.  Thus, SA-TECH has established a nontrivial competitive injury.  And, SA-TECH, as the current contract awardee, certainly has a substantial chance of winning the contract upon the reopening of competition, albeit, presumably, at less favorable terms than the original contract award.

Furthermore, in almost every decision in which the standing of a contract awardee to protest a procuring agency's corrective action was addressed, the court has concluded that the protester had standing.  See, e.g., Jacobs Tech. Inc., 2011 WL 2044581, at *6; Sheridan Corp., 95 Fed. Cl. at 149; Centech Grp., Inc., 78 Fed. Cl. at 504; Delaney Constr. Co., 56 Fed. Cl. at 474. The decision in Delaney Construction Co. is particularly instructive because it concerned, like this protest, a contract awardee's challenge to corrective action proposed, but not yet implemented, by the procuring agency.  See 56 Fed. Cl. at 472-74.  In that case, the court concluded that the contract awardee had standing: "With respect to the proposed corrective

---

determination is made, it is more properly considered as a question of potential rather than actual prejudice, and assessed based on the cumulative impact of the well-pled allegations of agency error (which are assumed true at this juncture of proceedings).").

action, plaintiff is a prospective offeror whose direct economic interest would be affected by the new award of the contract which would occur on the basis of the corrective action at issue." Id. at 474.  In fact, even the one decision in which a protester challenging the likely imposition of corrective action was found not to have standing supports standing in this protest.  In Outdoor Venture Corp., a contract awardee sought an injunction preventing the procuring agency from terminating the contract it had been awarded before the SBA determined that it was other than a small business.  2011 WL 3100343, at *2-3.  That determination rendered the awardee ineligible to compete for the contract, which was set aside for a small business.  Id. at *1.  Before the agency had taken any action based on the SBA's size determination, the awardee filed suit in the Court of Federal Claims.  Id. at *5.  The awardee relied upon the decisions in Jacobs Technology, Inc., Sheridan Corp., and Centech Group, Inc. to support its standing argument.  Id. at *6.  The court distinguished these decisions on the ground that the awardee did "not allege that the government has resolicited the contract or that it intend[ed] to do so."  Id. at *7 (emphasis added) (citations omitted); see also id. (holding that the protester's allegation that the procuring agency might be required to terminate the contract constituted a harm that was "neither concrete and particularized nor actual or imminent," but was instead a harm that was "conjectural or hypothetical" that did not confer standing to protest).  Outdoor Venture Corp. is distinguishable from this protest for at least two reasons.  First, SA-TECH has not been rendered ineligible to receive the awarded contract.  Second, because SA-TECH alleges that the Army intends to reopen the competition, amend the RFP, and accept revised proposals as part of its corrective action, it has articulated actual harm that it will suffer.  Because the United States has not supplied any reason to depart from the holdings of these prior decisions, the court finds that SA-TECH has standing to pursue this protest.

### 2. SA-TECH's Protest Is Ripe for Judicial Review

The United States also contends that SA-TECH's protest is not ripe for judicial review.[16] A claim is not ripe for judicial review when it is contingent upon future events that may or may not occur.  Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-81 (1985).  The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties," Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977), and it derives from both "Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction," Nat'l Park Hospitality Ass'n v. Dep't of the Interior, 538 U.S. 803, 808 (2003) (citing Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993)).

---

[16]  Kratos argues that one of SA-TECH's contentions–the impropriety of the Army's decision to amend the RFP–is not ripe for review.  Because this argument is encompassed by the more general argument advanced by the United States that SA-TECH's challenge to the Army's proposed corrective action is unripe in its entirety, the court will not address it separately.

In determining whether a claim is ripe for judicial review, courts must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Labs., 387 U.S. at 149. The first prong of the ripeness analysis is not satisfied unless "the challenged agency action is final." Tokyo Kikai Seisakusho, Ltd. v. United States, 529 F.3d 1352, 1362 (Fed. Cir. 2008); accord NSK, Ltd. v. United States, 510 F.3d 1375, 1384 (Fed. Cir. 2007) (citing Abbott Labs., 387 U.S. at 149). A final agency action displays two characteristics. "First, the action must mark the 'consummation' of the agency's decisionmaking process–it must not be of a merely tentative or interlocutory nature." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citation omitted). "[S]econd, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Id. at 178 (citation omitted). The second prong of the ripeness analysis is satisfied when the challenged agency action has an immediate, severe impact on the plaintiff. Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 170 (1967).

The United States argues the SA-TECH has failed to satisfy the first prong of the ripeness test because the Army's decision to take corrective action does not constitute a final agency action. More particularly, it contends that the Army's decision to take corrective action will not be fully consummated unless and until the Army reawards the contract to an offeror other than SA-TECH and that no legal consequences flow from the Army's decision to take corrective action because SA-TECH remains the contract awardee. With respect to the second prong, the United States asserts that SA-TECH would suffer hardship only if the Army awarded the contract to another offeror. The court is not convinced by the United States' arguments.

The Army's decision to take corrective action was memorialized in an April 22, 2011 letter to the GAO, in which it indicated that it had reviewed the supplemental protest and declared that it was "in its best interest to take corrective action." AR 1996. This declaration is not tentative or interlocutory in nature. Rather, the Army represented that upon review of the protest lodged by Kratos, it would take corrective action. There is no indication that the Army would do anything other than what it proposed. In fact, the Army considered its decision to be final, as reflected by its specific request to the GAO that it dismiss Kratos's protest because the proposed corrective action rendered the protest moot. Defense counsel subsequently confirmed at oral argument that the Army's decision to take corrective action remains unchanged. He explained that if the court dismissed the protest as unripe, the Army would proceed with its plan of corrective action, terminating its contract with SA-TECH and reopening the competition.[17] Thus, it is clear that the Army has committed to a specific course of action; it is not merely mulling various actions it might take. Moreover, the Army's decision to take corrective action

---

[17] During oral argument, in response to the court's inquiry regarding whether the Army still intended to take its proposed corrective action, defense counsel stated that he had conferred with his client on this issue and that the Army indicated that it would proceed with the corrective action as proposed. Counsel then turned to Tina Pixler, the Army attorney who signed the April 22, 2011 letter and who was present at oral argument, for confirmation. Ms. Pixler nodded her head in agreement.

immediately implicates SA-TECH's right and obligation to perform under the awarded contract and sets the procurement process back in motion. Thus, the Army's decision to take corrective action is a final agency action reviewable by this court.

SA-TECH has also demonstrated that the Army's decision to take corrective action has caused a severe and immediate impact on its business. SA-TECH, the current contract awardee, has been unable to proceed with work under the contract, depriving it of the income it expected to receive. In addition, the Army's proposed corrective action will result in the termination of its contract and require it to expend additional resources to recompete for that same contract. Furthermore, now that SA-TECH's contract price is in the public domain, SA-TECH will not only have to compete against the unsuccessful offerors, it will also have to compete against itself. Thus, if SA-TECH is successful in being awarded the contract for the second time, it will undoubtably be under far less favorable terms. Clearly, withholding judicial review of the Army's decision to take corrective action would create a hardship for SA-TECH.

The court's conclusion that SA-TECH's protest is ripe for review is in accord with other decisions addressing the issue.[18] See Jacobs Tech. Inc., 2011 WL 2044581, at *4-5; Sheridan Corp., 95 Fed. Cl. at 150; Ceres Gulf, Inc., 94 Fed. Cl. at 317; Centech Grp., Inc., 78 Fed. Cl. at 505-06. Moreover, as a prudential matter, the court sees no good reason to postpone review of SA-TECH's allegations until the Army implements its corrective action by terminating SA-TECH's contract and reopening the competition. Further factual development would not "significantly advance [the court's] ability to deal with the legal issues presented nor aid [it] in their resolution." Duke Power Co. v. Carolina Envtl. Study Grp., Inc., 438 U.S. 59, 82 (1978); accord Nat'l Park Hospitality Ass'n, 538 U.S. at 812; Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc., 527 F.3d 1278, 1295 (Fed. Cir. 2008). And, if the court delayed its review of the Army's proposed corrective action until a new contract was awarded, as suggested by the United States, there is a chance that SA-TECH's challenge to the corrective action would no longer be reviewable. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."); Sheridan Corp., 95 Fed. Cl. at 150 ("[W]ere the Court to dismiss [the protester]'s claims as not

_____

[18]   Madison Services, Inc., relied upon by the United States, is distinguishable. In that case, counsel for the protester, the intended contract awardee, alleged that counsel for the procuring agency "notified" the protester "that a decision had been made to follow the GAO recommendation" set forth in the GAO's decision sustaining the protest of an unsuccessful offeror. 90 Fed. Cl. at 676 (internal quotation marks omitted). There was no indication that the agency formally notified the GAO that it intended to take corrective action. Id. at 679. Thus, there remained the possibility that the agency would "reconsider its tentative decision" and choose to take a different path. Id. In this case, in contrast, the Army formally represented that it would take corrective action and it cannot revisit its decision without calling into question the GAO's dismissal of Kratos's protest at its request.

ripe for review, the current protest grounds later could be challenged as untimely if [the protester] does not prevail during the resolicitation process."); Centech Grp., Inc., 78 Fed. Cl. at 505 ("[T]he process Defendant and Intervenor seek to impose–deferring judicial review until after award–would render the grounds of Plaintiff's current protest untimely after award."). Thus, having found SA-TECH's complaint to be ripe for review, the court addresses the merits of SA-TECH's claims.

### III.  THE PARTIES' CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Each party has filed a motion for judgment on the administrative record pursuant to RCFC 52.1, urging the court to enter judgment in its favor.  In ruling on such motions, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)[19]).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record."  Bannum, Inc., 404 F.3d at 1356.

### A.  The Army's Decision to Take Corrective Action Constitutes a Significant Error in the Procurement Process

As previously noted, SA-TECH alleges three general grounds for its protest.  First, it contends that the Army's decision to take corrective action is arbitrary, capricious, and unreasonable because the decision was based on an electronic-mail message from a GAO attorney that is itself unreasonable.  Second, it asserts that the Army's proposed corrective action, standing on its own, lacks a rational basis and involves a violation of law, regulation, or procedure.  Third, it avers that even if the decision to take corrective action is appropriate, the corrective action proposed by the Army is overly broad.  The court concludes that SA-TECH's first two protest grounds have merit.

In a bid protest, the Court of Federal Claims reviews the challenged agency action pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4).  Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under this standard, the court "may set aside a procurement action if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  Centech

---

[19]  The decision in Bannum was based upon then-RCFC 56.1, which was abrogated and replaced by RCFC 52.1.  RCFC 52.1 was designed to incorporate the decision in Bannum.  See RCFC 52.1, Rules Committee Note (June 20, 2006).

Grp., Inc., 554 F.3d at 1037 (quoting Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332).

Procurement officials "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332 (internal quotation marks omitted). Thus, when a protester challenges the procuring agency's decision as irrational, the court's review is "highly deferential" to the agency's decision, Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and "[t]he court is not empowered to substitute its judgment for that of the agency," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). "Accordingly, the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332-33 (citation and internal quotation marks omitted); accord Advanced Data Concepts, Inc., 216 F.3d at 1058 ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."). When a protester claims that the procuring agency's decision violates a statute, regulation, or procedure, it must show that the violation was "clear and prejudicial." Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1333 (internal quotation marks omitted).

**1.  The Army's Reliance on the GAO Attorney's April 20, 2011 Electronic-Mail Message Renders Its Decision to Take Corrective Action Irrational**

The first protest ground asserted by plaintiff–that the Army's decision to take corrective action is arbitrary, capricious, and unreasonable because the decision is based on an electronic-mail message from a GAO attorney that is itself unreasonable–raises two threshold issues: was the Army's decision to take corrective action premised on the GAO attorney's April 20, 2011 electronic-mail message and, to the extent that it was, is the court empowered to review the electronic-mail message for rationality in the same way it can review a formal decision by the GAO recommending corrective action?

To answer the first question, the court looks to the timeline of events reflected in the administrative record. Kratos lodged its supplemental protest on April 4, 2011. On April 7, 2011, the GAO attorney informed the parties that in light of the supplemental protest, he was interested in whether the Army would continue to oppose the protest or take corrective action. Then, on April 11, 2011, the GAO attorney invited the Army to respond to comments made by Kratos about its initial protest, but specifically requested that the Army not respond to Kratos's supplemental protest. The Army complied with the request; its response did not address Kratos's supplemental protest. On April 20, 2011, in the electronic-mail message at issue, the GAO attorney conveyed his impressions of Kratos's supplemental protest. In a response sent that same day, the Army indicated that it understood the GAO attorney's position. Then, on April 22, 2011, the Army informed the GAO and the other parties that, after reviewing the supplemental

protest, it had decided to take corrective action.  The Army's April 22, 2011 letter constituted its first formal response to Kratos's supplemental protest.

The timeline suggests two possible scenarios.  One possibility is that the Army had been considering how to respond to the supplemental protest for more than two weeks, i.e., from the time that it was first advanced by Kratos, and that its April 22, 2011 letter was the culmination of its deliberations.  The fact that the Army did not address the merits of the supplemental protest before April 22, 2011, supports this scenario, as does the Army's failure to mention the GAO attorney's electronic-mail message in its letter.  The other possibility is that the position taken by the Army in its April 22, 2011 letter was prompted by the GAO attorney's April 20, 2011 electronic-mail message.  The brief period of time—two days—between the message and the letter supports this scenario.  Given the ambiguity regarding the true basis of the Army's decision to take corrective action, the court finds it reasonable to assume that the decision was based, at least in part, on the GAO attorney's April 20, 2011 electronic-mail message.

Assuming that the Army based its decision to take corrective action on the impressions conveyed by the GAO attorney in his electronic-mail message, the court must next determine whether it can review the message in the same way it reviews a formal GAO decision recommending corrective action.  This appears to be an issue of first impression.

There is no question that a court, in deciding the propriety of a procuring agency's implementation of corrective action recommended by the GAO, may review whether the GAO's recommendation was itself rational.  See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) ("[A] procurement agency's decision to follow the Comptroller General's recommendation, even though that recommendation differed from the contracting officer's initial decision, was proper unless the Comptroller General's decision itself was irrational."); Centech Grp., Inc., 79 Fed. Cl. at 563 n.2 ("[I]t is appropriate for this Court to consider the rationality of GAO's determination where the agency relied upon such determination in taking the corrective action at issue.").  The decisional law reflects, however, that as a general rule, courts have reviewed GAO recommendations only when they were included as part of a formal GAO decision.  See John Reiner & Co. v. United States, 325 F.2d 438, 442 (Ct. Cl. 1963) ("[I]t is the usual policy, if not the obligation, of the procuring departments to accommodate themselves to positions formally taken by the [GAO] with respect to competitive bidding." (emphasis added)); see also Interstate Rock Prods., Inc. v. United States, 50 Fed. Cl. 349, 363 (2001) (citing Honeywell for the proposition that "to the extent that an agency chooses to follow the advice of the GAO, courts should only intervene if the advice the agency receives is 'irrational,'" and concluding that the prior GAO decisions relied upon by the procuring agency in rejecting a bid as unresponsive were "eminently rational"); see also ManTech Telecomms. & Info. Sys. Corp., 49 Fed. Cl. at 62, 73-80 (analyzing, in a case where the procuring agency's proposed corrective action was based on the GAO's suggestion during the alternative dispute resolution process that it would sustain the protest before it, only whether the proposed corrective action was reasonable, and not whether the GAO's suggestion was rational).

-27-

In the present case, there is no formal GAO decision sustaining Kratos's protest and recommending corrective action. Rather, there are only the informal and nonfinal impressions of the GAO attorney, expressed in an electronic-mail message, indicating that the GAO would likely sustain Kratos's supplemental protest. Nevertheless, the court has a broad mandate to entertain bid protests and review government procurement decisions. If a procuring agency takes an action that is challenged in this court, this court has the responsibility to examine the basis for the agency's action, regardless of what that basis might be. In other words, when determining the propriety of a procuring agency's decision to take corrective action, the court may review the rationality of, as appropriate, the underlying formal GAO decision containing a recommendation that the agency take such action or the underlying informal suggestion by the GAO, or any other entity or individual, that such action might be proper. Thus, the court concludes that because the Army relied upon the GAO attorney's electronic-mail message in deciding to take corrective action, and only because the Army relied upon the message, it may review the message to determine whether it was rational.

The threshold issues thus resolved, the court turns to the substance of the GAO attorney's electronic-mail message. In his message, the GAO attorney reaches two conclusions. First, he opines that the GAO "need not resolve the issue of whether . . . the protester timely challenged" the Army's evaluation of proposals. Second, he indicates that the GAO would likely sustain Kratos's protest due to deficiencies in the source selection decision. Both of these conclusions are irrational.

The GAO is empowered to entertain protests "concerning an alleged violation of a procurement statute or regulation" so long as the protests are filed in accordance with the governing statutes. 31 U.S.C. § 3552(a) (2006). These statutes require the GAO to establish procedures for the "expeditious" resolution of the protests. Id. § 3555(a). Under this authority, the GAO adopted a regulation providing that the GAO "shall" dismiss a protest that is not timely filed, 4 C.F.R. § 21.5(e) (2011), unless it determines that the protest "raises issues significant to the procurement system" or finds that "good cause" exists to consider the protest, id. § 21.2(c). In other words, except under limited circumstances, the GAO may not entertain untimely protests because they are not filed in accordance with the governing statutes. The GAO's own decisions support this conclusion. See, e.g., Patricia A. Thompson-Agency Tender Official, B-310910.4, 2009 CPD ¶ 24 (Comp. Gen. Jan. 22, 2009) ("Our Bid Protest Regulations contain strict rules requiring timely submission of protests. . . . [T]he protest is untimely and, therefore, must be dismissed."); Goel Servs., Inc., B-310822.2, 2008 CPD ¶ 99 (Comp. Gen. May 23, 2008) ("Our timeliness rules reflect the dual requirements of giving parties a fair opportunity to present their cases and resolving protests expeditiously without unduly disrupting or delaying the procurement process. In order to prevent these rules from becoming meaningless, exceptions are strictly construed and rarely used. The 'good cause' exception is limited to circumstances where some compelling reason beyond the protester's control prevents the protester from filing a timely protest. The significant issue exception is limited to untimely protests that raise issues of widespread interest to the procurement community, and which have not been considered on the merits in a prior decision." (citations omitted)); Cornet, Inc., B-270330 et al., 96-1 CPD ¶ 189

(Comp. Gen. Feb. 28, 1996) (noting that the protest regulations require the dismissal of untimely protests and dismissing supplemental protest grounds as untimely).

Here, the GAO attorney asserted that the GAO "need not" consider the timeliness of Kratos's supplemental protest, and, although the court cannot completely discount the possibility that the GAO attorney was impliedly invoking one of the exceptions allowing the GAO to consider an untimely protest, there is no indication in the electronic-mail message that an exception to the timeliness rule applied.  Thus, the GAO attorney's statement that the timeliness of Kratos's protest was irrelevant clearly contravenes the statutory mandate that the GAO not entertain untimely protests.  When the GAO acts in violation of the law, the act lacks a rational basis.  See SP Sys., Inc. v. United States, 86 Fed. Cl. 1, 13 (2009) ("If the GAO recommendation is . . . plainly contrary to a statutory requirement, that decision is irrational and an agency action is not justifiably based upon it." (citing Grunley Walsh Int'l, LLC v. United States, 78 Fed. Cl. 35, 44 (2007))); Cal. Marine Cleaning, Inc., 42 Fed. Cl. at 295-96 (holding that the GAO's misapplication of late bid rule set forth in the FAR was irrational, and therefore the agency's reliance on the GAO's decision was improper); see also United States v. Amdahl Corp., 786 F.2d 387, 392-93 (Fed. Cir. 1986) ("Administrative actions taken in violation of statutory authorization or requirement are of no effect.").  The GAO attorney's statement on timeliness is therefore irrational.

The GAO attorney's analysis of the Army's evaluation of proposals suffers the same fate.  In the Source Selection Decision Memorandum, the Source Selection Authority reported the findings from the Army's evaluation and concluded that there were "no meaningful distinctions" among the noncost elements of the proposals.  AR 2013.  The Source Selection Authority acknowledged, however, that the proposals submitted by Kratos and SA-TECH were not identical: "[T]he main difference between the two offerors is that, as the incumbent, Kratos/WSS has the personnel with the specific TMO experience in their current employment and has proposed these employees for the follow-on ATFS requirement."  Id. at 2014.  She then explained how SA-TECH's proposal mitigated those differences.

[. . .]

Id.  In other words, she most assuredly compared the ability of Kratos, as the incumbent contractor, to supply personnel with specific experience with SA-TECH's proposal to supply personnel with general experience coupled with a plan to mitigate its failure to propose personnel with specific experience.  She then concluded that the "price/cost advantages of SA-TECH's proposal outweigh[ed] the possibility of a learning curve impact."  Id. at 2013.  It is readily apparent that the Source Selection Authority, upon comparing the proposals of Kratos and SA-TECH, clearly determined that the two proposals were not meaningfully distinct in the area of personnel experience and concluded that the benefit to the Army of SA-TECH's lower price was worth the possibility that some of SA-TECH's employees would lack specific experience.  Her

conclusion is entitled to deference.[20]  See Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 958-59 (Fed. Cir. 1993) ("Effective contracting demands broad discretion.  Accordingly, agencies 'are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government.'" (citations omitted) (quoting Tidewater Mgmt. Servs., Inc. v. United States, 573 F.2d 65, 73 (Ct. Cl. 1978))); Gen. Offshore Corp., B-251969 et al., 94-1 CPD ¶ 248 (Comp. Gen. Apr. 8, 1994) ("Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion."), quoted in E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996).

The GAO attorney did not afford the proper deference to the Army's source selection decision.  In fact, his electronic-mail message demonstrates that he completely misread the decision.  He wrote:

> The source selection fails to acknowledge and appreciate the concerns expressed in the evaluation of the Labor element, which serves as a key discriminator between the proposals.  That the two proposals were rated the same for this element is highly irrelevant; regardless of ratings, the source selection must look behind those ratings to consider the distinctions uncovered in the evaluation.  This source selection document fails to do that.

> Had the agency said, we recognize the value of incumbency and the advantage of the reduced risk in the incumbent's proposal, but that advantage is not worth the premium over the awardee's proposal, we would in all likelihood deny a challenge to the best value trade-off.  Those are not the facts here.  Here, the agency denied that there were proposal discriminators–documented in its evaluation–and there was a trade-off to be made between, on the one hand, an incumbent who guaranteed to deliver an experienced work force, and, on the other, a lower-priced offeror who did not and about whom the agency expressed reservations.

AR 1995.  First, contrary to the GAO attorney's observations, the Source Selection Authority did "acknowledge and appreciate the concerns" of the Technical Evaluation Committee regarding the experience of SA-TECH's proposed workforce; she set forth those concerns in her decision and explained that SA-TECH had sufficiently mitigated those concerns.  The Source Selection Authority also "look[ed] behind [the] ratings to consider the distinctions" identified by the

---

[20]  It is worth noting that during oral argument, SA-TECH's counsel indicated that once SA-TECH was awarded the contract, the incumbent personnel offered positions with SA-TECH accepted those positions, thus vindicating the rationality of, and the Source Selection Authority's reasonable reliance on, its mitigation plan.  Because this fact was not part of the administrative record, however, the court did not consider it in rendering its decision.

Technical Evaluation Committee; she both described the distinctions and explained why those distinctions were not meaningful.  Third, despite the GAO attorney's representations, the Source Selection Authority "recognize[d] the value of incumbency" and concluded that the value of incumbency was not worth the price premium–in the Source Selection Decision Memorandum she acknowledged that Kratos, as the incumbent contractor, had personnel with specific experience and explained that the cost advantage of SA-TECH's proposal outweighed the lack of specific experience of its proposed personnel.  Fourth, the Source Selection Authority acknowledged the distinctions between the proposals of Kratos and SA-TECH, finding them not to be meaningful; she did not, as the GAO attorney stated, "den[y] that there were proposal discriminators[.]"  Finally, contrary to the GAO attorney's assertion, the Source Selection Authority described both a tradeoff between Kratos's incumbency and SA-TECH's mitigation efforts and a tradeoff between the proposed prices and the relative experience levels of the proposed personnel.  All of these errors suggest that instead of applying the necessary amount of deference, the GAO attorney was substituting his judgment for that of the Army.  He may not do so.  Turner Constr. Co., 2011 WL 2714137, at *5 ("When an officer's decision is reasonable, neither a court nor the GAO may substitute its judgment for that of the agency.").  Accordingly, his analysis of the source selection decision is irrational.

Because the GAO attorney improperly declared that the timeliness of Kratos's protest was irrelevant and completely misconstrued the Source Selection Decision Memorandum, the contents of the GAO attorney's April 20, 2011 electronic-mail message are irrational.  As a result, to the extent that the Army's decision to take corrective action is based upon the message, it lacks a rational basis and is therefore arbitrary, capricious, and an abuse of discretion.

### 2.  The Army's Decision to Take Corrective Action Is Irrational and Unlawful

Although it is reasonable to assume that the Army's decision to take corrective action was based upon the GAO attorney's April 20, 2011 electronic-mail message, the administrative record also supports the possibility that the Army's decision was not prompted by the message, but instead reflects a conclusion arrived at independently, after an analysis of Kratos's supplemental protest.  To the extent that the Army did not rely on the electronic-mail message, the court analyzes the Army's decision to take corrective action as it would any other procurement decision and determines whether the decision to take corrective action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  The court will thus set aside the decision if it lacks a rational basis or involves a statutory or regulatory violation.[21]

---

[21]  The United States contends that the court must apply a different standard: that so long as the Army decided to take corrective action in good faith, the court must uphold the decision.  In support of this standard, the United States cites four decisions of the Court of Federal Claims.  See Def.'s Mot. 20 (citing Ceres Gulf, Inc., 94 Fed. Cl. at 318; Metro. Van & Storage, Inc. v. United States, 92 Fed. Cl. 232, 252-53 (2010); Seaborn Health Care, Inc. v. United States, 55 Fed. Cl. 520, 527 (2003); Griffy's Landscape Maint. LLC, 51 Fed. Cl. at 675).  Reliance on these decisions, however, is problematic.  As an initial matter, neither Metropolitan Van & Storage,

### a. The Army's Decision to Take Corrective Action Lacks a Rational Basis

The court first addresses whether the Army's decision to take corrective action in this case has a rational basis.  As with all procurement decisions, an agency has broad discretion to take necessary corrective action.  See Jacobs Tech. Inc., 2011 WL 2516416, at *3 (citing Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332).  Accordingly, the court affords the

---

Inc. nor Griffy's Landscape Maintenance LLC sets forth the good faith standard advanced by the United States.  They merely stand for the proposition that a procuring agency has broad discretion to decide whether corrective action is appropriate and the court should not substitute its judgment for that of the agency if the decision to take corrective action was reasonable.

The origin of the good faith standard discussed in the remaining decisions sheds doubt on its usefulness in the Court of Federal Claims.  The court in Ceres Gulf, Inc. quotes Seaborn Health Care, Inc., for the proposition that "[w]here 'a decision to amend a solicitation and request revised offers is made in good faith, without the intent to change a particular offeror's ranking or to avoid an award to a particular offeror, that decision will not be disturbed.'"  94 Fed. Cl. at 318.  The court in Seaborn Health Care, Inc. cites ManTech Telecommunications & Information Systems Corp., which, in turn, quotes a decision from the GAO:

> [T]he GAO has repeatedly held that "[a]n agency may amend a solicitation, and request and evaluate another rounds of [best-and-final offers] where the record shows that the agency made the decision to take this action in good faith, without the specific intent of changing a particular offeror's technical ranking or avoiding an award to a particular offeror."

49 Fed. Cl. at 73 (quoting Fed. Sec. Sys., Inc., B-281745.2, 99-1 CPD ¶ 86 (Comp. Gen. Apr. 29, 1999)).  The GAO, however, applies a different standard of review to bid protests than does the Court of Federal Claims.  While the GAO is charged with determining whether a procuring agency has violated a statute or regulation, 31 U.S.C. § 3554(b)(1); 4 C.F.R. § 21.8(a), the Court of Federal Claims must determine whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  An agency acting in good faith may still violate this standard.  See Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1333 (noting that 28 U.S.C. § 1491, as amended by the ADRA, requires the application of "the [Administrative Procedure Act] standard of review which is not limited to fraud or bad faith by the contracting officer," and that "bad faith on the part of the procuring official is only one of several criteria which may trigger judicial review of a contracting officer's decision"); Keco Indus., Inc. v. United States, 492 F.2d 1200, 1203-04 (Ct. Cl. 1974) (noting that a procuring agency's action may be held to be arbitrary and capricious if there was "subjective bad faith on the part of the procuring officials," no reasonable basis for the decision, or a violation of statute or regulation–implying that bad faith and lack of a rational basis are separate grounds for recovery).  Thus, the court will not apply the standard advocated by the United States.

Army's decision to take corrective action deference and will uphold the decision if it is rational, reasonable, and coherent and reflects due consideration of all relevant factors.

The Army's decision to take corrective action in this case is set forth in one document: its April 22, 2011 letter to the GAO.  The court's review of the Army's decision is therefore limited to the rationale supplied in that letter.  See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974) (holding that a court "may not supply a reasoned basis for the agency's action that the agency itself has not given"), cited in OMV Med., Inc. v. United States, 219 F.3d 1337, 1344 (Fed. Cir. 2000) (applying the rule in a bid protest).  In the letter, the Army briefly summarizes, in two sentences, Kratos's initial and supplemental protests.  Then, without any analysis, it declares: "After a review of the supplemental issues, the Army has determined that it is in its best interest to take corrective action."  AR 1996.  Although the lack of explicit rationale is troubling, because the Army indicates that it plans to amend the RFP "to explain the intention of providing Kratos' CBA in the solicitation," allow revised proposals, and render a new source selection decision, the court infers that it was the Army's intent to take corrective action in response to all of the issues raised in Kratos's GAO protest.  See id. at 286 ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.").  Upon a review of the administrative record, the court concludes that the Army's decision to take corrective action in response to Kratos's GAO protest is irrational.

Kratos alleged in its initial protest that the Army, by issuing Amendment 3, required the offerors to propose a labor mix in compliance with the CBA and that the Army failed to consider the offerors' compliance with the CBA when evaluating their proposed labor mixes.  However, there is no basis for Kratos's interpretation of Amendment 3, as consistently argued by the Army and suggested by the GAO attorney.  The original RFP indicated that the successful offeror would be required to pay its employees a minimum amount of wages and fringe benefits, and that the relevant wage and fringe benefit amounts were described in the specified wage determination.  After the Army and the incumbent contractor's employees agreed to a CBA, the Army issued Amendment 3 to substitute a new wage determination as the relevant source for minimum wage and fringe benefit amounts for specified labor categories, and Amendment 4 to provide a source for minimum wage and fringe benefit amounts for proposed employees not covered by the new wage determination.  There is no indication in Amendment 3 that the Army intended to do anything other than change the minimum wage and fringe benefit amounts that the successful offeror would be required to pay its employees; the sections of the RFP describing the proposal requirements and evaluation criteria were not amended.

That the CBA was included as part of the new wage determination does not alter the analysis; the purpose of the new wage determination was clearly identified as providing minimum wage and fringe benefit amounts that the successful offeror would be required to pay its employees.  Moreover, the Service Contract Act does not require successor contractors to comply with any provision of a predecessor's CBA other than the wage and fringe benefit provisions.  See 29 C.F.R. § 4.163(a) (2009) ("The obligation of the successor contractor is limited to the wage and fringe benefit requirements of the predecessor's collective bargaining

agreement and does not extend to other items such as seniority, grievance procedures, work rules, overtime, etc."). Thus, the Army's decision to take corrective action in response to Kratos's initial protest concerning Amendment 3 to the RFP is irrational.

In its supplemental protest, Kratos alleged that by assigning "outstanding" ratings to each factor for each proposal, the Army converted what was supposed to be a best-value determination into a lower-price, technically acceptable evaluation.  It expressed particular concern with the Army's assignment of an "outstanding" rating to SA-TECH's proposal for the Labor element, an "outstanding" rating to SA-TECH's proposal for the Management subfactor, and a purported "outstanding" rating to SA-TECH's proposal for the Participation by Small, Minority, and Disadvantaged Businesses element in light of the Technical Evaluation Committee's comments in its Final Evaluation Report and the Source Selection Authority's comments in the Source Selection Decision Memorandum.  As noted above, the Army has broad discretion to determine which proposal represents the best value to the government.  See Lockheed Missiles & Space Co., 4 F.3d at 958-59.  Accordingly, the court will not disturb the ratings assigned by the agency absent a showing that they have no rational basis.  See E.W. Bliss Co., 77 F.3d at 445 (noting that "challenges to the procurement [that] deal with the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess").  No such showing has been made with respect to Kratos's supplemental protest.

As an initial matter, the Technical Evaluation Committee was entitled to apply its experience and expertise and assign favorable ratings to SA-TECH's proposal even though it had some concerns with certain aspects of the proposal.  See Fort Carson Support Servs. v. United States, 71 Fed. Cl. 571, 586 (2006) ("[T]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations.").  And, the Source Selection Authority was well within her rights to consider the Technical Evaluation Committee's Final Evaluation Report and determine the weight to give the committee's findings and whether the committee's concerns were mitigated by the committee's other findings.  See id.  In fact, it is her responsibility to independently make such a determination.  See FAR 15.308 ("The source selection authority's . . . decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation.  While the [source selection authority] may use reports and analyses prepared by others, the source selection decision shall represent the [source selection authority]'s independent judgment.").

Nevertheless, Kratos contends for the first time in its reply that the Source Selection Authority deviated from the Technical Evaluation Committee's findings "to justify higher adjective definitions [sic]" in violation of the Source Selection Plan.  Kratos's Reply 28-29.  Although the court does not look favorably on arguments first raised in a reply, Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002), it maintains the discretion to consider them, SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1320 n.9 (Fed. Cir. 2006).  Kratos's argument regarding the requirements of the Source Selection Plan fails for three reasons.  First,

the Source Selection Plan prohibited the adjustment of findings to better match an adjectival rating definition, and, given the general nature of the prohibition, apparently applied to both the Technical Evaluation Committee and the Source Selection Authority.  There is no evidence in the administrative record that the Technical Evaluation committee or the Source Selection Authority altered any of their findings to better fit an adjectival rating definition.  Second, the Source Selection Authority did not assign adjectival ratings for any of the proposals that were higher than those assigned by the Technical Evaluation Committee.  In fact, she actually lowered the ratings for SA-TECH's and Kratos's proposals for the Participation by Small, Minority, and Disadvantaged Businesses element.  Third, the Source Selection Authority did not deviate from the Technical Evaluation Committee's findings; rather, she evaluated and weighed those findings.  Thus, as required by the Source Selection Plan, the committee's findings formed the basis for the source selection decision.

Accordingly, the Technical Evaluation Committee and the Source Selection Authority, in evaluating SA-TECH's proposal, were empowered to assign an "outstanding" rating for the Labor element even though they reported some concerns with the experience level of SA-TECH's proposed personnel.  Such a rating meant that notwithstanding the noted concerns, the Technical Evaluation Committee and Source Selection Authority had complete confidence that SA-TECH could effectively and efficiently perform the work under the contract with its proposed labor mix, directly charged hours, and personnel.  They could also assign an "outstanding" rating to SA-TECH's proposal for the Management subfactor even though SA-TECH's proposed [. . .] lacked the same amount of experience as the [. . .] proposed by Kratos, a rating that meant that despite the noted concerns, they had complete confidence that SA-TECH could perform the contract requirements effectively and efficiently.  Similarly, the Technical Evaluation Committee and the Source Selection Authority could assign "outstanding" and "satisfactory" ratings, respectively, to SA-TECH's proposal for the Participation by Small, Minority, and Disadvantaged Businesses element even though SA-TECH did not identify specific businesses.  The rating ultimately assigned by the Source Selection Authority meant that she had reasonable confidence that SA-TECH could effectively and efficiently perform the contract requirements.  All three ratings assigned to SA-TECH's proposal reflected the Army's determination that SA-TECH could mitigate the Army's concerns and were, in that regard, entirely rational.

Furthermore, the fact that the Army assigned all three proposals the same ratings does not render the ratings per se improper.  See United Concordia Cos. v. United States, No. 11-276C, 2011 WL 2906142, at *8 (Fed. Cl. July 1, 2011) ("That the [source selection authority] found [two offerors] to be equal in non-price factors, which coincides with their identical adjectival ratings for technical merit, proposal risk, and past performance, is not evidence of a lack of comparative assessment.").  Indeed, it is incumbent upon the procuring agency and reviewing court to look beyond adjectival ratings because "'[p]roposals with the same adjectival rating are not necessarily of equal quality . . . .'"  Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 640-41 (2002) (quoting Oceaneering Int'l, Inc., B-287325, 2001 CPD ¶ 95 (Comp. Gen. June 5, 2001)).  There has been no showing that the ratings themselves were irrational; the evidence in the administrative record supports the conclusion that the Source Selection Authority looked

beyond the adjectival ratings and rendered a source selection decision based on the Technical Evaluation Committee's comments and her own review of the offerors' proposals. This is precisely the task that procuring officials are charged with performing.

In sum, because the source selection decision was a rational exercise of the Army's discretion and should therefore not be disturbed, the Army's decision to take corrective action in response to Kratos's protests is irrational. Moreover, to the extent that the Army determined, independently of GAO attorney, that the Source Selection Authority's tradeoff analysis did not properly consider the differences among the proposals, such a determination lacks a rational basis. See supra section III.A.1. Accordingly, whatever its basis, the Army's decision to take corrective action is arbitrary, capricious, and an abuse of discretion.

### b. The Army's Decision to Take Corrective Action Violates Procurement Statutes and Regulations

Although the court has determined that the Army's decision to take corrective action lacks a rational basis, it briefly considers whether the Army's decision to take corrective action also violates a statute or regulation. SA-TECH argues that the Army, in proposing corrective action, is violating the requirements that it promote and provide for full and open competition through the use of appropriate competitive procedures, 10 U.S.C. § 2304(a) (2006); FAR 6.101; award the contract to the successful offeror, FAR 15.504; and determine that the procurement did not comply with a statute or regulation, 10 U.S.C. § 2305(f); FAR 33.102(b). SA-TECH, in other words, contends that the Army's proposed corrective action disturbs a contract award made in compliance with the applicable statutes and regulations. The court agrees. Because the Army properly evaluated the offerors' proposals and rendered a source selection decision, its decision to take corrective action upsets a properly awarded contract and therefore violates the laws meant to guarantee fair competition in government procurements.

### 3. Summary

The Army's decision to take corrective action is arbitrary, capricious, an abuse of discretion, and unlawful, and therefore constitutes a significant error in the procurement process. Having so concluded, the court need not address SA-TECH's alternative contention that even if the decision to take corrective action was appropriate, the corrective action proposed by the Army is overly broad. The court's next inquiry, therefore, is whether SA-TECH is prejudiced by the Army's error.

### B. SA-TECH Is Prejudiced by the Army's Decision to Take Corrective Action

If a protester demonstrates that there was ""a significant error in the procurement process," it must then show "that the error prejudiced it." Data Gen. Corp., 78 F.3d at 1562; see also Bannum, Inc., 404 F.3d at 1351 (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the

court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct"). "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error." Banknote Corp. of Am., 365 F.3d at 1350 (quoting Emery Worldwide Airlines, Inc., 264 F.3d at 1086); see also Data Gen. Corp., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").

SA-TECH easily satisfies the prejudice inquiry. SA-TECH is the current contract awardee. Thus, the corrective action proposed by the Army would lead to the termination of a contract that SA-TECH already won. If the Army did not take its proposed corrective action, SA-TECH would retain its contract. It therefore has more than a substantial chance of being awarded the contract absent the Army's error; it is 100% certain to be the contract awardee.

## IV.  DECLARATORY AND INJUNCTIVE RELIEF

SA-TECH has demonstrated that the Army's decision to take corrective action constitutes a significant, prejudicial procurement error and that it is therefore entitled to a judgment in its favor. The court thus turns to SA-TECH's request for declaratory and injunctive relief. Such equitable remedies are available to successful protesters under the Tucker Act. See 28 U.S.C. § 1491(b)(2) (permitting the Court of Federal Claims to "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs"). SA-TECH first seeks declarations that (1) the contents of the GAO attorney's April 20, 2011 electronic-mail message and the Army's decision to take corrective action in response to the message are "arbitrary and capricious and contrary to precedent, unwarranted, and overbroad"; (2) the Army's decision to take corrective action is "arbitrary and capricious and contrary to precedent, unwarranted, and overbroad"; and (3) its contract with the Army is "valid and not subject to corrective action" based on Kratos's GAO protest. Because the practical effect of this requested relief is to prevent the Army from taking the proposed corrective action, it is "tantamount to a request for injunctive relief." PGBA, LLC v. United States, 389 F.3d 1219, 1228 (Fed. Cir. 2004). Thus, the court will limit its discussion to SA-TECH's request for the entry of a permanent injunction prohibiting the Army from undertaking its proposed corrective action.[22]

---

[22]  SA-TECH also requests an injunction preventing the Army from implementing any other corrective action in response to Kratos's GAO protest. Such an injunction would be overbroad. For one, there is no evidence in the administrative record that the Army believes another course of corrective action would be appropriate; it would therefore be mere speculation that the Army would attempt to craft another plan. Additionally, the court has held, as the basis for finding the Army's proposed corrective action arbitrary, capricious, and an abuse of discretion, that the grounds of Kratos's GAO protest were meritless. Thus, any future plan of corrective action based on those grounds would contravene the court's holding.

"Injunctive relief is appropriate if it 'enjoin[s] the illegal action and return[s] the contract award process to the status quo ante.'" Turner Constr. Co., 2011 WL 2714137, at *9 (quoting Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994)).  In entertaining a request for permanent injunctive relief, a court must review the procuring agency's action and determine whether (1) the protester has succeeded on the merits; (2) the protester will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief.  PGBA, LLC, 389 F.3d at 1228-29.

By demonstrating that the Army's proposed corrective action constitutes a significant, prejudicial error in the procurement process, SA-TECH has succeeded on the merits.  The court concludes that SA-TECH also satisfies the remaining three factors justifying an award of injunctive relief.

The first of these factors–irreparable harm–is satisfied because, absent an injunction preventing the implementation of the Army's proposed corrective action, SA-TECH would both lose a valuable contract that it has lawfully won and be forced to expend additional resources to recompete in circumstances where there has been unequal disclosure regarding the offerors' proposed prices.[23]  As the court explained in Sheridan Corp.:

> [U]nless the agency's corrective action is enjoined, [the protester] faces
> irreparable harm from an unnecessary recompetition for a contract it has already
> won.  Without an injunction, [the protester] may lose the contract and the
> associated revenues.  Even if [the protester] is able to retain the contract following
> the proposed resolicitation, [the protester] would have been forced to recompete in

_____

[23]  The disclosure of SA-TECH's price in the award notification letters, standing alone, does not constitute irreparable harm.  The government is required to disclose the price of an awarded contract to the unsuccessful offerors.  See FAR 15.503(b)(1) (requiring the procuring agency to provide unsuccessful offerors with a notice that includes "[t]he items, quantities, and any stated unit prices of each award"); FAR 15.506(d) (requiring the procuring agency to disclose "[t]he overall evaluated cost or price . . . of the successful offeror" during postaward debriefings).  As the United States notes, if such disclosure constituted irreparable harm, the government would be hampered in its attempts to take corrective action to cure legitimate deficiencies unearthed during bid protests.  See also Griffy's Landscape Maint. LLC, 51 Fed. Cl. at 675 (noting that the "price bids were disclosed by operation of law" and that "[i]n the context of pre-award negotiations the contracting officer is given latitude in deciding whether to cancel a solicitation and request new bids after price offers have been disclosed"); DGS Contract Serv., Inc. v. United States, 43 Fed. Cl. 227, 238 (1999) ("[W]hen an unsuccessful offeror lawfully obtains source selection information, such as a competitor['s] prices and technical scores, and the agency subsequently properly reopens negotiations, the agency may disclose similar information to all the competitors to eliminate any competitive advantage obtained.").

circumstances where its winning price had already been revealed to the
competition.

95 Fed. Cl. at 155.  Moreover, because SA-TECH has established that it is prejudiced by the
Army's decision to take corrective action, the court presumes that SA-TECH has suffered
irreparable harm.  See Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994)
("A movant that clearly establishes likelihood of success on the merits receives the benefit of a
presumption of irreparable harm."), cited in CW Gov't Travel, Inc. v. United States, 61 Fed. Cl.
559, 577 (2000).

    In addition, the balance of hardships weighs in SA-TECH's favor.  If the Army was
permitted to pursue its plan of corrective action, it would be required to spend time, money, and
energy on terminating SA-TECH's contract, amending the RFP, reevaluating proposals, issuing a
new source selection decision, and rewarding a contract.  In fact, no benefit accrues to the Army
by allowing it to proceed with its corrective action plan when a properly awarded contract already
exists.  If both the protester and the government stand to suffer harm in the absence of an
injunction, then it makes good sense to issue the injunction.

    Further, the public interest is served by enjoining the Army from taking the proposed
corrective action.  This court has repeatedly recognized that there is an important public interest
in fair and open competition in the government procurement process.  See, e.g., Bona Fide
Conglomerate, Inc. v. United States, 96 Fed. Cl. 233, 242 (2010); PGBA, LLC v. United States,
57 Fed. Cl. 655, 663 (2003).  The Army's implementation of corrective action would upset the
award of a contract that was properly awarded through fair and open competition, rendering the
competition unfair.  Thus, rather than interfering with the procurement process or dictating what
the Army must procure, as the United States argues, the court is merely upholding an award the
Army lawfully made.

    As a final matter, the court must address the United States' contention that the court
should decline to grant injunctive relief on national security grounds.  The United States makes
the sweeping assertion that because the contract at issue involves the testing and evaluation of
missile/weapons systems, the court should disregard the merits of the protest and deny injunctive
relief.  In considering a bid protest, the court is required to "give due regard to the interests of
national defense and national security . . . ."  28 U.S.C. § 1491(b)(3).  The United States Court of
Appeals for the Federal Circuit has addressed this provision of the Tucker Act on only one
occasion, when it remarked that "section 1491(b)(3) merely instructs courts to give due regard to
the issue of national defense and national security in shaping relief."  PGBA, LLC, 389 F.3d at
1226.  On the other hand, section 1491(b)(3) has been addressed in many cases before the Court
of Federal Claims.  This court agrees with the following assessment:

    The Tucker Act requires that the Court consider the interest of national defense in
    its bid protest decisions.  Nonetheless, "claims of national security . . . are often
    advanced by the Government in challenges to procurement decisions.  The Court

will not blindly accede to such claims but is bound to give them the most careful
consideration." While the Court certainly must give serious consideration to
national defense concerns and arguably should err on the side of caution when
such vital interests are at stake, allegations involving national security must be
evaluated with the same analytical rigor as other allegations of potential harm to
parties or to the public.

Gentex Corp. v. United States, 58 Fed. Cl. 634, 655 (2003) (citations omitted). Here, the United
States has not explained how upholding a lawfully awarded contract would negatively affect the
nation's defense or security. The court therefore finds that its assertion lacks merit.

## V.  CONCLUSION

In sum, the court finds that injunctive relief is appropriate in this case. Accordingly, it is
**ORDERED** that:

- The motions to dismiss filed by the United States and Kratos are **DENIED**;

- The motion for judgment on the administrative record filed by SA-TECH is
  **GRANTED**;

- The cross-motions for judgment on the administrative record filed by the
  United States and Kratos are **DENIED**;

- The Army is **ENJOINED** from implementing the corrective action it
  proposed in its April 22, 2011 letter to the GAO in response to the GAO
  attorney's April 20, 2011 electronic-mail message and/or Kratos's GAO
  protest; and

- The court has filed this opinion under seal. The parties shall confer to
  determine proposed redactions agreeable to all parties. Then, by **no later
  than Wednesday, August 24, 2011**, the parties shall file a joint status report
  indicating their agreement with the proposed redactions, **attaching a copy of
  those pages of the court's opinion containing proposed redactions, with
  all proposed redactions clearly indicated.**

No costs. The clerk is directed to enter judgment accordingly.

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge